## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **CALVIN TANKESLY, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:14-cv-0911** |
| | ) | **Judge Aleta A. Trauger** |
| **CORRECTIONS CORPORATION OF** | ) | |
| **AMERICA,** *et al.,* | ) | |
| | ) | |
| **Defendants** | ) | |

## MEMORANDUM

At issue are plaintiff Calvin Tankesly, Jr.'s claims under 42 U.S.C. § 1983 and state law against defendants Dr. Robert Coble, Nurse Karen Orton, and Nurse Practitioner Susan Martin, based on their allegedly deliberate indifference to the plaintiff's serious medical needs. Now before the court are the plaintiff's Objections (Doc. No. 297) to the magistrate judge's Report and Recommendation ("R&R") (Doc. No. 284), recommending that the defendants' Motions for Summary Judgment (Doc. Nos. 218 (filed jointly by Coble and Orton), 223 (filed by Martin)) be granted, that all of the plaintiff's claims under federal law be dismissed with prejudice and that his state law claims be dismissed without prejudice. The defendants have filed Responses to the Objections (Doc. Nos. 304, 305), and the plaintiff filed Replies to both (Doc. Nos. 306, 307).

When a party files objections to a magistrate judge's report and recommendation regarding a dispositive motion, the district court must review *de novo* any portion of the report and recommendation to which objections are properly lodged. Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B) & (C). In conducting its review, the district court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

The court has conducted a *de novo* review of the defendants' motions and the entire evidentiary record in light of the plaintiff's Objections and finds that the § 1983 claims against Martin and Coble should be dismissed on the basis that the facts viewed in the light most favorable to the plaintiff fail to establish that either of these defendants acted with deliberate indifference to his serious medical needs. The undisputed facts also establish that Orton did not act with deliberate indifference to the plaintiff's needs during the period of time leading up to his cancer diagnosis. However, disputed issues of fact preclude summary judgment in favor of Orton on the § 1983 claim based on her treatment of the plaintiff during his recovery from cancer. Finally, the court rejects the magistrate judge's recommendation that any state law claims be dismissed *without* prejudice. Instead, the court will grant summary judgment in favor of the defendants as to those claims and dismiss them with prejudice.

## I.     PROCEDURAL BACKGROUND

Tankesly was a state prisoner confined at the South Central Correctional Facility ("SCCF") in Clifton, Tennessee during the time frame relevant to this action. SCCF was operated at the time by Corrections Corporation of America ("CCA"). The plaintiff is currently confined at the Northwest Correctional Complex.

Proceeding *pro se* and *in forma pauperis*, Tankesly filed the Verified Complaint in this action on April 1, 2014, naming eleven defendants, including CCA and various CCA executives and health care workers employed at SCCF. The Complaint asserts claims under 42 U.S.C. § 1983; the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12191 *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a); §§ 504 and 704(a) of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*; 42 U.S.C. §§ 1981(a), and "1981 2(b)(3)"; it also asserts that the defendants violated the plaintiff's rights under the Tennessee constitution and state law. In December 2015, all claims against all defendants were dismissed, except for the § 1983 and state law claims against defendants

Coble, Orton, and Martin. (Doc. No. 192.)

Defendants Coble and Orton filed their joint Motion for Summary Judgment on May 26, 2016; defendant Martin filed a separate Motion for Summary Judgment on June 1, 2016. In connection with their motions, the defendants filed a complete copy of the plaintiff's prison medical record along with numerous other exhibits, supporting Memoranda of Law, and Statements of Undisputed Facts. The defendant responded by filing his "Objections" to the defendants' motions, Objections to their Statements of Undisputed Facts, and his own exhibits. The R&R recommending entry of judgment in the defendants' favor was filed on March 2, 2017. The court granted the plaintiff's request for an extension of the deadline for filing his Objections to the R&R. The Objections have now been filed and fully briefed.

## II.     RELEVANT FACTS

### A.     Facts Related to Claims Against Nurse Practitioner Susan Martin

According to Nurse Practitioner Susan Martin, while Tankesly was incarcerated at SCCF, he was designated as a chronic-care inmate because he suffered from a number of health problems that required regular medical evaluation and treatment. (Martin Decl. ¶ 3, Doc. No. 226.) On July 16, 2012, Martin evaluated Tankesly in the chronic-care clinic and documented, among other things, an enlarged lymph node on his neck, which she described as pea-sized. (Martin Decl. ¶ 4.)

Martin knew, based on her medical training, that enlarged lymph nodes are most commonly caused by infections, particularly viral infections such as a common cold. (*Id.*) Martin observed that Tankesly was "well appearing" and that his vital signs were within normal limits, but she ordered a complete-blood-count ("CBC") test to rule out infection. She states that she instructed Tankesly to return in one month for reevaluation and ordered repeat blood work in

five months (Martin Decl. ¶ 5; *see also* Med. Rec. 8, 97, 270.[1])

Martin received the results from Tankesly's CBC panel on July 25, 2012, and the results were within normal limits. At this point, according to Martin, she did not believe or have any reason to believe that Tankesly was suffering from any serious undiagnosed illness. (Martin Decl. ¶ 6.)

Tankesly returned for follow-up on August 16, 2012. At that time, Martin examined his pharynx with an otoscope and also performed a gloved-hand examination of his throat. She determined that he still had a palpable pea-sized lymph node on his neck. (Martin Decl. ¶ 7; *see also* Med. Rec. 8.) She avers that it was her belief that the best course of action at that time was to monitor Tankesly. She alleges that she informed him of the results of the CBC and instructed him to return as needed. (Martin Decl. ¶ 8.) At that time, she claims, she had no reason to be concerned. (Martin Decl. ¶ 9.)

Martin states that Tankesly had blood drawn on November 21, 2012 for another CBC panel, as Martin had ordered during his July 16, 2012 visit. This CBC panel was normal with two minor exceptions that did not suggest cancer. (Martin Decl. ¶ 11.) Martin examined these results on November 28, 2012 and determined that no medical intervention was necessary. (Martin Decl. ¶ 11.) Martin did not actually see Tankesly at that time.

Tankesly underwent a chest x-ray on December 12, 2012. (Med. Rec. 9.) Martin was not involved in the decision to send him for an x-ray. The documentation associated with the x-ray indicates that Tankesly was experiencing a questionable cough and tired easily. (Martin Decl. ¶ 12; Med. Rec. 9.) The chest x-ray was related to a tuberculosis diagnosis in 1997 and was

---

[1] The Medical Record is comprised of Document Numbers 219-5, 220, and 221. Each page of the record has a clear Bates number stamped at the top of the page in red. For convenience and consistency, the court refers to the Medical Record by that pagination rather than by document filing number or electronic page number.

ordered for precautionary reasons; it was not related to Tankesly's complaint about his lymph node. (Martin Decl. ¶ 12; Med. Rec. 9–10, 465.)

According to Martin, she next saw Tankesly on January 8, 2013 for a routine six-month chronic-care evaluation. She maintains that, between August 16, 2012 and January 8, 2013, Tankesly did not submit any written complaints regarding a swelling in his neck and that she did not hear him make any verbal complaints regarding his neck. (Martin Decl. ¶ 10; *see also* Med. Rec. 271, 10.) At the January 8 appointment, Martin reviewed the chest x-ray results and determined that they were normal. (Martin Decl. ¶ 12; Med. Rec. 10.) She prescribed numerous medications, including Prilosec, Pravastatin, Neurontin, Robaxin, and Clotrimazole, among others. (Med. Rec. 98.) Martin's handwritten notes in the plaintiff's Medical Record do not document a complaint related to the lymph node, and Martin alleges that Tankesly did not complain to her about the swollen lymph node at that appointment. (Martin Decl. ¶ 13.)

Tankesly did not present to Martin again until April 30, 2013. Between January 8 and April 30, 2013, Tankesly had seen other medical practitioners with complaints regarding the swollen lymph node and other symptoms, as discussed below, but he had not seen Martin. (*See* Med. Rec. 10.) On April 30, 2013, Tankesly first saw Nurse Karen Orton complaining of a knot on the side of his neck, swelling in his cheek and jaw, and difficulty swallowing. He also informed Orton that the knot had increased in size over the past few weeks. (Med. Rec. 11.) Orton referred him to Martin, who saw him the same day. (Martin Decl. ¶ 16; Med. Rec. 11.)

When she saw him on April 30, 2013, Martin documented Tankesly's complaints of difficulty swallowing, headache, knot on the right side of his neck, and pain in his ear. Her physical examination of Tankesly revealed a mass on his neck of two to three centimeters. Tankesly reported the mass had been that size for approximately a year. (Med. Rec. 11.) Martin

noted that "prior documentation does not reveal this." (Med. Rec. 11.) She states in her Declaration that her medical notes of July 2012 establish that his recollection in that regard was inaccurate, since her evaluations during the summer of 2012 indicated that the swelling was the size of a pea. (Martin Decl. ¶ 16.) Tankesly requested to see a doctor, and Martin referred Tankesly to Dr. Robert Coble, to be seen "ASAP per IM [inmate] request." (Med. Rec. 11.)

Martin did not oversee Tankesly's treatment after that time, but she did see him or help with his needs a few more times. She states that, on June 20, 2013, she documented, likely on behalf of Dr. Coble, that Tankesly had tonsillar cancer, needed a radiographic scan and a dentist appointment, and was to prepare for radiation. (Martin Decl. ¶ 18.) She saw Tankesly again on July 1, 2013 for his routine, six-month chronic-care evaluation. It appears that she did not actually see or treat Tankesly again after that date. Shortly thereafter, Martin left the employment of CCA and did not treat, evaluate, or interact with Tankesly again. (Martin Decl. ¶ 19.)

In his Objection to Martin's Statement of Undisputed Facts (Doc. No. 271), Tankesly purports to dispute nearly every one of Martin's statements of fact, referring generally to his response in opposition to Martin's Motion for Summary Judgment and to his Exhibits A, B, and F, which consist of his own Sworn Affidavit, the sworn statements of several witnesses, over 80 pages of letters written to various persons and entities dating from November 2010 through January 2015, and photographs downloaded from the internet showing the mouth sores of people undergoing chemotherapy/radiation therapy for mouth and throat cancer. (Doc. Nos. 258-1, 258-2, 259-3.)

In objecting to Martin's statement that she first became aware of the swollen lymph node on July 16, 2012, Tankesly points out that Martin purportedly documented the plaintiff as having

cancer as early as December 27, 2011. (Doc. No. 271, at 2 (citing Med. Rec. 4–5).)[2] He asserts that this note in his Medical Record is dispositive of Martin's knowledge that he had cancer, but that assertion is contradicted by his claim that he did not begin complaining of swelling in his neck until January 2012. (Doc. No. 271 ¶ 3.) Moreover, he concedes under oath that he did not begin complaining about the swelling until around July 2012. (*See* Pl. Aff. ¶ 1, Doc. No. 258-1, at 10 ("As early as July 16, 2012 maybe a few weeks earlier I started asking about a Suspicious Mass [lump] in my neck at sick call and was seen by Susan Martin, Nurse Practitioner.").)

Tankesly generally disputes that Martin's decision to send him for a CBC panel constituted standard procedure or was medically appropriate. He does not dispute that she wrote "RTC" on the treatment note (for "return to clinic"), but states that this notation was never shown to him and that she never actually told him to return to the clinic as needed. (Doc. No. 271 ¶ 2.) He also asserts that, if Martin's allegations were true, he "would not have proceeded with the letters, declarations and affidavits demanding help as early as January 2012." (Doc. No. 271 ¶ 2.) He claims that, if "Martin had acted in her role as a responsible Nurse Practitioner and order[ed] the proper test, she would have *known immediately* there was a reason to believe that Plaintiff Calvin Tankesly was suffering from an illness . . . that could have Been Prevented." (Doc. No. 271 ¶ 6.)

In his Sworn Affidavit, Tankesly states that Martin falsely documented the lump as the

---

[2] Page 5 of the plaintiff's Medical Record is an unsigned Health Classification Summary, purportedly dated 12-27-11, on which some unidentified medical practitioner noted a "Health Related Restrictions" Code of G, which corresponded with "Cancer." The person completing the form also circled the "G" next to the word Cancer. There is no explanation in the record for this assessment, and no indication that Tankesly was exhibiting symptoms or that Martin had any reason to believe in December 2011 that Tankesly was suffering from any form of cancer. Moreover, although Tankesly attributes the form to Martin, the form is not signed. (Med. Rec. 5.) In any event, it appears the plaintiff was not aware of this record until he conducted discovery in this action.

size of a pea in August 2012 when it "was actually the size of a walnut." ((Pl. Aff. ¶ 2, Doc. No. 258-1.) He further claims: "Without access to all the dates of my clinic visits I repeatedly asked about the Suspicious Mass that continued to grow, between my medical visits." (Pl. Aff. ¶ 3.) Although he asserts, in his "Objections" to Martin's Statement of Facts, that "Martin heard also of Plaintiff's concern from other nurses that Plaintiff complained to at the medication window" (Doc. No. 271 ¶ 3), he does not point to actual evidence in the record to support that statement. In his Affidavit, he further avers that he asked about the "Suspicious Mass" at his chronic care visit with Martin in January 2013, but Martin told him not to worry, that it was "nothing to be concerned about." (Pl. Aff. ¶ 4.) He also alleges that he finally insisted that he see a doctor in May 2013, at which time Martin relented and referred him to Dr. Coble. (Pl. Aff. ¶ 5.) He saw Dr. Coble for the first time on May 3, 2013. (*Id.*)

Tankesly also filed with the court copies of letters to various individuals regarding his health care complaints. The earliest letter in which he documents complaints related to his swollen lymph node is dated November 3, 2012. This letter, addressed to Wendy Ashe, Health Administrator of SCCF, states that Tankesly had a swollen gland in his neck and that he had asked Nurse Practitioner Susan Martin about it "for nearly four months," but she continued to dismiss his concerns as insignificant without providing appropriate testing or access to a doctor. (Doc. No. 258-2, at 7.) He asserted that, as a result, he was being denied medical care as guaranteed by the Tennessee and United States constitutions. The record contains additional letters to Ashe and others, including Donna White, TDOC Health Director, CCA CEO Damon Hiniger [sic],[3] and Lester Lewis, M.D., dating from November 2012 and continuing through March 2013. In these letters, Tankesly continued to complain that Susan Martin was refusing to

---

[3] The CEO of CCA (now called CoreCivic) is Damon Hininger.

allow him access to a medical doctor or to refer him for further testing of the swelling on his neck. (Doc. No. 258-2, at 8–11, 13–17.)

### B. Facts Related to Claims Against Nurse Karen Orton and Dr. Robert Coble

The facts pertaining to Orton and Coble's joint Motion are set forth in their Statement of Undisputed Facts. (Doc. No. 222.) The plaintiff filed "Objections" to the defendants' Statement, objecting to nearly every fact asserted therein on the basis that they are "misplaced," that they pertain to treatment by outside providers who are not parties to this lawsuit, and that they are generally not relevant to the plaintiff's claims. (*See generally* Doc. No. 259.) In support of his Objections, Tankesly refers broadly to his Exhibits A and B (Doc. Nos. 258-1, 258-2), which include the plaintiff's Sworn Affidavit and the plaintiff's letters to various CCA and TDOC authorities about his complaints.

There is no dispute that, after seeing Martin for his chronic care visit on January 8, 2013, the plaintiff did not return to sick call until April 9, 2013. At that visit, he complained again about the swollen lymph node on the right side of his neck and reported that he was coughing up blood four to five times a month, that swallowing was difficult, that the lymph node was tender when touched, and that the swollen lymph node had "been there a year." (Med. Rec. 10.) The chart entry for that day states "refer to MD for lymph node." (Med. Rec. 10.) The signature in the medical chart indicates that the plaintiff saw nurse Treasa Petty at that time, not Martin or Orton. (*Id.*)

The plaintiff does not dispute the defendants' assertion that he did not return to sick call between January 8 and April 9, 2013, but he insists that he "registered <u>countless complaints</u> daily when signing for his chronic care Medications at the Medication Window for no less than ten months." (Doc. No. 259 ¶ 5, Pl.'s Resp. to Coble and Orton's Statement of Undisp. Facts.). The

only evidence in the record to support this assertion, as indicated above, is the plaintiff's allegation in his Sworn Affidavit that, "[w]ithout access to all the dates of my clinic visits I repeated asked about the Suspicious Mass that continued to grow, between my medical visits." (Pl. Aff. ¶ 3.)

The chart includes an entry from April 22, 2013 that is completely illegible except for the words "will reschedule." (Med. Rec. 10.) According Dr. Coble, Tankesly was scheduled to see him on that date for his complaints about the swollen lymph node. (Coble Decl. ¶ 7, Doc. No. 219-1.) Coble reviewed Tankesly's medical chart, requested more information from nurses, and noted that the visit should be rescheduled due to the facility's being on lockdown. (Coble Decl. ¶ 7.)

On April 24, 2013, the plaintiff presented again at the clinic and again saw Nurse Petty. He continued to complain of pain in his right ear, neck, and jaw and difficulty swallowing. Petty noted that the swelling to the right side of his neck was visible and that the plaintiff would be referred to the dentist. (Med. Rec. 10.)

The plaintiff returned to the clinic on April 30, 2013. On that date he was seen by defendant Karen Orton. (Med. Rec. 11.) Orton documented a knot on the right side of the plaintiff's neck with swelling in the cheek and jaw area. According to Orton's note, the plaintiff reported that the knot had "gotten bigger the past few weeks" and that he continued to have difficulty swallowing. (Med. Rec. 11.) Orton referred him immediately to the nurse practitioner. As noted above, Susan Martin also saw him the same day and referred him to Dr. Coble to be seen "ASAP." (Med. Rec. 11.)

Coble saw the plaintiff three days later, on May 3, 2013. Coble noted that the plaintiff reported the development of a hard, two-centimeter nodule over the course of "a year or so," now

associated with dysphagia and a twenty-pound weight loss. He ordered a referral to an Ear, Nose and Throat specialist ("ENT") and a CT scan. He also noted that he was "anticipating onco [oncology] referral." (Coble Decl. ¶ 8; Med. Rec. 12, 99.)

Consistent with Coble's order, Tankesly was taken to Wayne County Medical Center on May 7, 2013 for a CT scan. (Coble Decl. ¶ 10; Med. Rec. 12, 99, 290.) He was evaluated by Dr. Stephen Parey, an ENT with Middle Tennessee ENT Specialists, on May 15, 2013. (Coble Decl. ¶ 8; Med. Rec. 12, 99, 291–94.) Dr. Parey performed a biopsy of the mass and diagnosed the plaintiff as having a malignant neoplasm of the right tonsil and malignant neoplasm metastasis to the cervical lymph nodes—in other words, metastatic tonsillar cancer. He ordered a referral to an oncologist. (Med. Rec. 294.) Dr. Coble informed Tankesly that he had cancer on May 22, 2013. (Pl. Aff. ¶ 5; Med. Rec. 13.)

Based on Parey's referral, Tankesly was evaluated by an oncologist, Dr. Mark Messenger, on May 30, 2013. (Coble Decl. ¶ 12; Med. Rec. 99, 281–82.) Messenger determined that treatment required a course of combined chemotherapy and radiation and referred the plaintiff for radiation. Messenger's letter to Coble stated: "We will see him back in the next week or so. I will talk to Radiation in the meantime and hopefully get him started in relatively short manner for his chemotherapy and radiation." (Med. Rec. 282.)

On June 5, 2013, the plaintiff presented at the prison clinic requesting to see Coble to discuss his diagnosis and his increased pain level. Orton noted that she was referring the plaintiff to Dr. Coble. (Med. Rec. 13.) He returned the next day to review his medical records. "R. Littrell" noted that Tankesly was "concerned with the possibility of having cancer." (Med. Rec. 13.)

Tankesly was transported to Maury Regional Medical Center Cancer Center on June 17,

2013 to see saw Dr. Joel Kochanski, a radiation oncologist. (Coble Decl. 13; Med. Rec. 100, 300–03, 322.) Kochanski, like Messenger, recommended a combined course of chemotherapy and radiation. He noted that Tankesly reported a pain rating of 6 out of 10, but he did not recommend pain intervention. (Med. Rec. 303.) He noted that the plaintiff needed a "treatment planning" PET/CT scan and dental evaluation before radiation therapy could begin. (Coble Decl. ¶ 15; Med. Rec. 303.) He anticipated a start date within "two–three weeks." (Med. Rec. 303.)

Following the dental evaluation and PET scan, Tankesly saw Messenger again, on Coble's orders, on July 17, 2013. (Coble Decl. ¶ 18; Med. Rec. 16, 102, 308.) Messenger noted that Tankesly was to follow up with him on August 5, 2013 to start chemotherapy and that he would need to continue seeing Messenger "each Monday starting 8/5/13 for at least the next 8 wks." (Med. Rec. 308.)

Between August 5, 2013 and September 26, 2013, Tankesly was transported to outside medical providers numerous times for radiation and chemotherapy treatments. He finished his last chemotherapy and radiation treatments on September 26, 2013. (Coble Decl. ¶ 19; Med. Rec. 16–32, 106–13, 315–36, 397–98.)

During this time period, Tankesly refused his radiation and chemotherapy treatment at least once. (Med. Rec. 21, 406.) The defendants allege that Tankesly also refused his Ensure or Boost nutritional supplemental drinks on "multiple occasions." (Coble Decl. ¶ 21; *see also* Med. Rec. 19, 21, 404, 405, 22, 407, 408 (indicating he refused Ensure or Boost seven times from Aug. 24–31, 2013); 25, 30, 409, 410 (skipped four supplements from Sept. 14–17, 2013 (9/14/13); 413–16 (skipped four supplements between Oct. 25, 2013 and Jan. 11, 2014). The plaintiff insists that he only refused the Boost and Ensure in August and September 2013 because he was in severe pain, unable to swallow, and vomiting up his medications. (*See* Pl. Aff. ¶¶ 6, 9,

10.)

This statement is substantiated by the Medical Record, which shows that his chemotherapy doctor ordered placement of a feeding tube ("PEG tube") on August 28, 2013, because the plaintiff was unable to talk or swallow. (Pl. Aff. ¶ 22.) Coble authorized the placement of the PEG tube on September 4, 2013, and the tube was surgically inserted on September 16, 2013.[4] (Coble Decl. ¶ 23; Med. Rec. 28–29, 109, 110.) Tankesly complains that Wendy Ashe entered an order that the PEG tube should not be used and that, in fact, it was never used after it was inserted. (Pl. Aff. ¶ 22.) He also alleges that, by that time the tube was placed, he was able to swallow again (Pl. Aff. ¶¶ 22, 33)[5], suggesting that there was no need for it to be used.[6]

Tankesly states that he refused the cancer therapies because he was in pain and frustrated that Coble would not see him to evaluate the sores in his mouth and throat or order sufficient pain medication. Specifically, the plaintiff complains that his radiation oncologist prescribed time-released morphine, but Coble would not authorize it. (Pl. Aff. ¶¶ 7–16.) Tankesly alleges that, even at a meeting arranged with Wendy Ashe, other officials, the plaintiff, and Coble on August 26, 2013, Coble refused to speak directly with the plaintiff or acknowledge his condition or pain level. The plaintiff complained at that meeting that he was frustrated that no one was taking his complaints seriously and that he had lost a significant amount of weight as a result of having not eaten anything for five days. (Pl. Aff. ¶ 17.) Coble stated only that he would not

---

[4] Around the same time, beginning on September 14, 2013, the plaintiff began complaining of blood in his urine. He was taken to the emergency room for diagnosis and treatment of what turned out to be a urinary tract infection. (Med. Rec. 337–51.)

[5] The court has located one reference to usage of the PEG tube: the plaintiff was given "60 cc H20 per tube" on 9/19/13. (Med. Rec. 31.)

[6] The plaintiff also began inquiring about the possibility of removing the PEG tube in November and December 2013. (Pl.'s Ex. C, Doc. No. 258-3, at 5.)

prescribe pain medication other than Lortab. (Pl. Aff. ¶ 18.) The plaintiff alleges that he told his radiation oncologist on August 27, 2013 that he wanted to discontinue treatment, not because he wanted to die,  but because he could not handle the pain without adequate medication. The doctor talked him into continuing treatment by telling him the pain would continue to get worse even without treatment and that his tumor would return if he did not finish his course of treatment. (Pl. Aff. ¶¶ 19–20.) The plaintiff concedes that Coble increased his Lortab 7.5  to three times a day on August 30, 2013. (Pl. Aff. ¶ 27.)

The feeding tube was removed on January 3, 2014. Coble asserts that the tube was removed because Tankesly had begun to regain weight, so the tube was no longer necessary. (Coble Decl. ¶ 23; Med. Rec. 35–36.) The plaintiff denies that he had actually gained significant weight. The plaintiff states that he weighed 239 pounds in January 2013. Plaintiff's Exhibit D, titled "Weight Loss/Gain Record," is sworn under penalty of perjury. It reflects that the plaintiff had lost 25 pounds by July 2013, before beginning chemotherapy and radiation, and weighed 174 by the time his treatments ended on September 23, 2013. ((Pl.'s Ex. E, Doc. No. 258-4, at 2.) From the end of September through the end of December 2013, his weight fluctuated around 172 pounds. He weighed 168 on December 27, 2013, down from 173 at the beginning of December. (*Id.* at 3.) In mid-December, it increased to 180 or close thereto for about a week, and then steadily dropped when his Ensure was reduced and then discontinued. (*Id.*) Regardless, the plaintiff does not allege that there was ever a point that he was unable to swallow at all and therefore needed the PEG tube after it was inserted. His complaint is that Coble refused to provide effective pain control and continuously tinkered with the amount of Ensure he was allowed to receive, without actually monitoring the plaintiff's weight or overall condition.

The plaintiff submitted as an exhibit his Sick Call Requests dating from June 4, 2013

through November 3, 2013 (Pl.'s Ex. C., Doc. No. 258-3, at 1–9.) Many of these document complaints about pain relief and nutritional supplementation. His request dated August 23, 2013 notes that this is his "FIFTH REQUEST" to see the doctor, implying that the other four had been denied or ignored. (Doc. No. 258-3, at 4.) The record does not include any sick call requests predating his cancer diagnosis demanding to see the doctor relating to the swelling in his neck.

By February 2014, Tankesly's cancer had resolved. (Coble Decl. ¶ 24.) Coble ordered a follow-up CT scan in October 2014, which indicated that the plaintiff remained cancer-free at that time. (Coble Decl. ¶ 25.) Another follow-up examination with an ENT on March 3, 2015 revealed no evidence of cancer. (Coble Decl. ¶ 26.) The plaintiff's medical record reflects that he continued to complain about difficulty swallowing, eating, and gaining weight throughout that time frame. (*See, e.g.*, Med. Rec. 40–42 (complaining of sores in mouth and inability to eat in March and April, 2014); Med. Rec. 54 (requesting that order for Ensure/Boost be increased, stating he was still not able to gain weight), Med. Rec. 59 (on transfer to NWCX, complaining of continued problem with lack of saliva and difficulty swallowing).) However, the record also shows that he weighed 189 on April 24, 2014 (Med. Rec. 43) and 182 in September and November 2014 (Med. Rec. 50). He weighed 180 when he was transferred to Northwest Correctional Complex ("NWCX") on March 18, 2015. (Med. Rec. 59.)

Dr. Coble asserts generally that, from the time he first saw the plaintiff for the swelling in his neck on May 3, 2013 through the date he was transferred to NWCX almost two years later, he entered, approved, or reviewed over sixty orders relating to the plaintiff's cancer treatment. These include orders referring him to outside providers; orders for CT and PET scans; transport orders; orders for pain medication, specifically Lortab; orders for Phenergan, Miracle Mouthwash, Boost and Ensure; and orders for the feeding tube placement and removal. (Coble

Decl. ¶¶ 29, 30.) Coble alleges that he also "monitored and treated" the plaintiff throughout the process of his cancer treatment, by "reviewing and approving his medical file, examining [him], and counseling [him]." (Coble Decl. ¶ 31.) According to Coble, he never refused or denied Tankesly medical care or treatment. (Coble Decl. ¶ 33.) He attests that he acted in good faith as a reasonably prudent medical professional in all his interactions with the plaintiff and that his treatment of Tankesly at all times met or exceeded the standard of medical care in a corrections setting. (Coble Decl. ¶ 31.)

Tankesly specifically denies that Coble ever "counseled" him or monitored him and maintains that Coble only rarely examined him. ((Pl. Aff. ¶¶ 8, 9, 18; Reply in Supp. of Objs. to R&R, Doc. No. 306, at 2.) He insists that Coble was aware of the sores and blisters on the plaintiff's tongue and throat but refused to order adequate pain relief and nutritional supplements. (Doc. No. 306, at 2 (citing Pl.'s Ex. C, Doc. No. 258-3, showing sick call requests that Coble purportedly ignored).) He claims that Coble tinkered with the amount of Ensure he was authorized to receive, but the continuous changes did not correlate with substantial weight gain by the plaintiff. (Pl. Aff. ¶¶ 52, 72; Weight Log, Pl.'s Ex. D, Doc. No. 258-4, at 2–3.)

Defendant Orton also treated Tankesly after referring him to Martin on April 30, 2013. She referred him to Coble in connection with the plaintiff's complaints about pain on June 5, 2013, as a result of which Coble ordered Lortab on June 10, 2013. (Orton Decl. ¶ 7, Doc. No. 219-2; Med. Rec. 13, 100.) She referred him for pain again on July 18, 2013, and Coble again ordered Lortab. (Orton Decl. ¶ 8; Med. Rec. 16, 104 ("Increase Lortab to 7.5 BID x 180 days").) Orton assisted in preparing the plaintiff's medical packets in connection with his outside appointments. (Orton Decl. ¶ 9.) She also provided him with prescribed medication, dispensed Ensure and Boost, and performed PEG tube flushes. (Orton Decl. ¶¶ 5, 10.) According to Orton,

she never refused or denied Tankesly medical care or treatment. (Orton Decl. ¶ 11.)

Like Coble, Orton attests that she acted in good faith as a reasonably prudent medical professional in all her interactions with the plaintiff and that her treatment of him at all times met or exceeded the standard of medical care in a corrections setting. (Orton Decl. ¶ 12.)

The plaintiff insists that Orton withheld Boost and Ensure drinks from him and deliberately sabotaged his recovery. For instance, in his Verified Complaint, he alleges that Orton "set out to Sabotage Plaintiff's Recovery . . . by distributing his Flavored Ensures to every inmate prescribed Boost Nutrition Drinks, deliberately leaving Plaintiff with NO Nutritional Intake for as long as 90(+) days which continues as this claim is being prepared." (Verif. Compl. at 13 ¶ 43.) In his Sworn Affidavit, he alleges that Orton refused to provide prescribed medication, specifically Omeprazole for acid reflux, from September 18 through September 24, 2013 (Pl. Aff. ¶¶ 35, 37, 39, 41–43), and Ensure. He states: "It is virtually impossible to keep a record of every time they DID NOT have Ensure, it is so frequent, nearly every weekend, because **Orton** gave it to anyone. This negligence is prohibiting me from Recovery, slowing my Healing and diminishing any weight gain from one day to the next." (Pl. Aff. ¶ 46.) On December 13, 2013, Orton was distributing medications at the pill window and asked the plaintiff for his identification card. The plaintiff claims she did this purely out of malice, never having asked him for identification in the three years of his going to the pill window, and that he was forced to return to his cell to retrieve his identification card, even though it was 19 degrees outside. He also complains that, on the same date, Orton handed sealed bottles of Ensure to other inmates but opened his before handing it to him. (Pl. Aff. ¶ 57.) He claims generally that Orton deliberately interfered with his recovery, causing unnecessary stress and anxiety, despite knowing the harm that stress can delay recovery from serious illness. (Pl. Aff. ¶ 63.) He

complains generally about her speaking hatefully and threateningly to him at every interaction.

The plaintiff complains generally that the medical staff did not have any Ensure to distribute to him at various times, in particular for nine straight days during December 2013. He alleges that during this time period, he was without any nutrition at all, because he was still not capable of eating real food. (Pl. Aff. ¶ 73.) He does not tie the lack of Ensure to specific acts by Orton other than to blame her generally for sabotaging his recovery and distributing Ensure to other inmates, despite Wendy Ashe's directive that Tankesly should be the only inmate receiving flavored Ensure. (Pl. Aff. ¶ 56.)

The plaintiff submits the declarations and affidavits of other prisoners who purport to have personally witnessed Orton and other medical staff withhold Ensure and other medication in "complete disregard" for Tankesly's obvious pain and suffering. (*See, e.g.*, Tony Robinson Decl., Doc. No. 258-1, at 19–20; James Allen Decl., Doc. No. 258-1, at 27–28.)

The plaintiff wrote letters and had others write letters on his behalf, complaining in particular about the lack of adequate pain control and nutrition while his treatment was ongoing. (*See, e.g.*, 8/26/2013 Letter from Ronald Small, Assistant Fed. Public Defender, to Warden Arvil Chapman, requesting that he "facilitate Mr. Tankesly receiving the pain treatment that he requires").

## II.     STANDARD OF REVIEW

In reviewing a motion for summary judgment, the court must "constru[e] the evidence and draw[] all reasonable inferences in favor of the nonmoving party." *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011). Summary judgment is appropriate where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The key issue is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Rocheleau v. Elder Living Constr., LLC*, 814 F.3d 398, 400 (6th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Id.* at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Id.*

## III.     DISCUSSION

All three defendants argue, in their respective motions, that (1) any claims based on events that took place more than one year prior to the filing of the Verified Complaint in this action are barred by the statute of limitations; (2) the undisputed facts establish that the defendants did not deny the plaintiff necessary medical treatment or act with deliberate indifference to his serious medical needs, for purposes of the plaintiff's claims under 42 U.S.C. § 1983; and (3) the state law claims are subject to dismissal because the plaintiff failed to comply with the statutory prerequisites for bringing a medical malpractice claim under state law, and because the undisputed facts do not establish negligence. The defendants argue in the alternative that the court should decline to exercise jurisdiction over the state claims if the federal claims are dismissed on the merits. (Doc. Nos. 219, 225.)

The magistrate judge recommends granting summary judgment to Coble on the grounds that the undisputed facts establish that Coble did not act with deliberate indifference to the

plaintiff's medical needs. He recommends that summary judgment in favor of Orton and Martin be granted on statute of limitations grounds, and he, therefore, did not reach the merits of the claims against them. Finally, he recommends that the court decline to exercise jurisdiction over the state law claims and that those claims be dismissed without prejudice. The plaintiff objects strenuously to the dismissal of his claims.

### A.    Statute of Limitations

The magistrate judge recommends granting summary judgment in favor of both Martin and Orton on the basis of the statute of limitations. Regarding Martin, he found that the statute began to run on December 27, 2011, but he elected to use July 16, 2012 as the date on which the one-year limitations period began to run. (Doc. No. 294, at 16.) He found that the limitations period expired on July 16, 2013 and that tolling while the plaintiff exhausted his administrative remedies, or while he received cancer treatment, was not appropriate, because the limitations period expired before any tolling would have begun. He found that the statute began to run on the claims against Orton on July 3, 2012, based on the plaintiff's unambiguous allegation that Orton had prohibited him from seeing Coble for "304 days" prior to May 3, 2013, when Coble first examined him. (Doc. No. 284, at 19 (citing Doc. No. 259 at 6 ¶ 8).)

Although the plaintiff did not respond to the defendants' statute-of-limitations arguments in his Response to the Motions for Summary Judgment, he objects to the R&R on the basis that (1) the magistrate judge's reliance on December 27, 2011 as the date the statute of limitations began to run is improper, because the plaintiff was unaware of the existence of that notation in his medical record until he took discovery in this action; (2) he did not know or suspect that he had a cause of action as early as July 2012 based solely on the swelling in his neck; (3) the statute of limitations did not accrue until May 2013, when the biopsy revealed cancer and the

plaintiff actually learned that he had suffered damages as a result of the defendants' inaction; (4) equitable estoppel applies to toll the statute of limitations because the defendant took steps to prevent the plaintiff from timely filing; and (5) the continuing violation doctrine applies, because Martin's actions "inflicted continuing and accumulating harm," based on a "long standing and demonstrable policy" of discrimination. (Doc. No. 297, at 15 (citations omitted).)

As set forth below, the court finds that the plaintiff's claims did not accrue until he learned of his cancer diagnosis. The court therefore finds, without reaching the plaintiff's arguments regarding tolling and estoppel, that his claims against Martin and Orton are not barred by the statute of limitations.

### *1. Accrual of the Cause of Action*

"The statute of limitations applicable to a § 1983 action is the state statute of limitations applicable to personal injury actions under the law of the state in which the § 1983 claim arises." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). The applicable limitations period in Tennessee is one year. Tenn. Code Ann. § 28-3-104(a). *Howell v. Farris*, 655 F. App'x 349, 351 (6th Cir. 2016) (citations omitted).

"Although the applicable time period is borrowed from state law, the 'date on which the statute of limitations begins to run in a § 1983 action is a question of federal law.'" *Id.* (quoting *Eidson*, 510 F.3d at 635). Under federal law, the limitations period ordinarily begins to run "when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* That is, the cause of action accrues upon the occurrence of the event that "should have alerted the typical lay person to protect his or her right." *Id.* (quoting *Kuhnle Bros., Inc. v. Cnty. of Geauga*, 103 F.3d 516, 520 (6th Cir. 1997)). At that point, the plaintiff has a "complete and present cause of action" such that he may "file suit and obtain relief." *Johnson v. Memphis Light*

*Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)).

Accrual principles are "governed by federal rules conforming in general to common-law tort principles." *Wallace*, 549 U.S. at 388. No single accrual rule applies to a § 1983 action; rather, it appears that courts apply "the rule that applies to the common-law cause of action most similar to the kind of claim the plaintiff asserts." *Devbrow v. Kalu*, 705 F.3d 765, 767 (7th Cir. 2013) (citing *Wallace*, 549 U.S. at 388); *see also Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 389 (4th Cir. 2014) ("[T]o determine the date of accrual for a particular § 1983 claim, a court must look to the common-law tort that is most analogous to the plaintiff's § 1983 claim and determine the date on which the limitations period for this most analogous tort claim would begin to run." (*citing Wallace*, 549 U.S. at 388)); *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208 (10th Cir. 2014) ("Following *Wallace*, we determine the accrual date of Plaintiff's claim by looking to the accrual date for the common-law tort most analogous to her § 1983 claim").

"The tort claim most closely analogous to a deliberate-indifference claim premised on a medical error is medical malpractice." *Devbrow*, 705 F.3d at 768. In the medical malpractice context, the Sixth Circuit holds that a cause of action accrues, not simply at the time of the plaintiff's injury, but when the plaintiff "knows both the existence and the cause of his injury." *Amburgey v. United States*, 733 F.3d 633, 636 (6th Cir. 2013) (quoting *United States v. Kubrick*, 444 U.S. 111, 113 (1979)). More specifically, a medical malpractice claim accrues "when a plaintiff possesses enough information with respect to [his] injury that, '[h]ad [he] sought out independent legal and medical advice at that point, [he] should have been able to determine in the [limitations] period whether to file an administrative claim.'" *Hertz v. United States*, 560

F.3d 616, 618 (6th Cir. 2009) (quoting *McIntyre v. United States*, 367 F.3d 38, 53 (1st Cir. 2004)). Determining when a plaintiff has such knowledge is "necessarily fact-intensive." *Hertz*, 560 F.3d at 619.

The federal courts also recognize that, when a plaintiff's claim of malpractice is predicated upon "a physician's failure to diagnose, treat, or warn" and that this failure "results in the development of a more serious medical problem," identifying the injury and its cause is more difficult than when "affirmative conduct by a doctor inflicts a new injury." *Augustine v. United States*, 704 F.2d 1074, 1078 (9th Cir. 1983). In the former type of case:

> the injury is not the mere undetected existence of the medical problem at the time the physician failed to diagnose or treat the patient or the mere continuance of that same undiagnosed problem in substantially the same state. Rather, the injury is the *development* of the problem into a more serious condition which poses greater danger to the patient or which requires more extensive treatment.

*Id.* (emphasis in original).

Consequently, in a case involving failure to diagnose or treat, a plaintiff's cause of action accrues when he "becomes aware or through the exercise of reasonable diligence should have become aware of the development of a pre-existing problem into a more serious condition." *Id.*; *see also Harvey v. United States*, 685 F.3d 939, 948 (10th Cir. 2012) ("Before [the plaintiff's] misdiagnosis claim could accrue, he must have been aware—or through the exercise of reasonable diligence should have been aware—that the lack of proper treatment had caused his broken hand to develop into a more serious condition."); *Arroyo v. United States*, 656 F.3d 663, 669 (7th Cir. 2011) ("A plaintiff's claim accrues the first time the plaintiff knew, or a reasonably diligent person in the plaintiff's position, reacting to any suspicious circumstances of which he or she might have been aware, would have discovered that an act or omission attributable to the

government could have caused his or her injury.").[7]

Thus, for instance, in *Meyer v. United States*, 23 F. Supp. 3d 861 (W.D. Mich. 2014), the court noted that, under federal law, a tort claim generally accrues at the time of the plaintiff's injury, but a medical malpractice claim accrues when the plaintiff "knows both the existence and cause of his injury." *Id.* at 863 (quoting *United States v. Kubrick*, 444 U.S. 111, 113, 120 (1979)). Under that rule, the *Meyer* court held that the plaintiff's medical malpractice claim under the Federal Tort Claims Act, based on a CT scan revealing possible cancer, did not accrue until the plaintiff actually learned, five years after the scan, that the scan had revealed an abnormality that required follow up. Only at that point did he learn that he had a cause of action based on the defendants' failure to render a timely diagnosis of cancer. The court expressly held that the cause of action did not accrue when the doctor failed to inform the plaintiff of the results of his CT scan or even when he was diagnosed with cancer three years later, or when the hospital released its medical records to him, which contained the doctor's notes from the CT scan, noting

---

[7] The court finds that *Scott v. Ambani*, 577 F.3d 642 (6th Cir. 2009), does not compel a different result. In that case, the plaintiff alleged that his doctor was deliberately indifferent to his medical needs in connection with his treatment for prostate cancer. There, the defendant informed the plaintiff in March 2002 that he had an elevated PSA, indicating a possibility of prostate cancer. The doctor performed a biopsy but did not find cancer. He recommended that the plaintiff follow up with his regular physician in a year. The plaintiff alleged that the doctor failed to pursue additional testing or treatment options, as a result of which the plaintiff suffered distress, "thinking that he could be dying from cancer" and that he experienced a delay in the treatment of cancer. In October 2004, he still had a high PSA level and was referred back to the same doctor for a second biopsy. In January 2005, this biopsy revealed cancer.

Even though the parties did not challenge the district court's findings regarding the statute of limitations, the Sixth Circuit noted that the trial court had "correctly concluded that Scott's claim against Dr. Ambani accrued in 2002," when the doctor refused the plaintiff's requests for further testing and treatment. *Id.* at 646. "According to the complaint, it was this denial which caused Scott to experience mental and emotional distress regarding the uncertainty of his diagnosis. This mental and emotional distress forms the basis of Scott's claims against Dr. Ambani . . . ." *Id.* That case is distinguishable on the basis that the plaintiff here complains that it was the delay in treatment itself that caused the plaintiff's cancer to progress and to require more aggressive treatment, not that the failure to perform additional testing in 2012 caused emotional distress.

the abnormality and recommending follow-up. *Id.* at 864. Instead, it accrued when he was told, in 2012, that his cancer could have been detected—and presumably treated—in 2007 instead of 2010. *Id.* at 865 (citing *Augustine*, 704 F.2d at 1078).

Applying these principles in the § 1983 context, courts have held that a plaintiff's cause of action based on a failure to diagnose cancer, resulting in progression of the disease over time and more intensive treatment than would have been required if it had been detected sooner, does not accrue until the plaintiff is actually diagnosed with cancer. In particular, in *Devbrow*, the plaintiff knew even before he went to prison that he was at elevated risk for prostate cancer. When he arrived at prison, he told the intake physician that he had prostate problems and would need to be tested for prostate cancer within two to four years. Four years later, in February 2004, the prison doctor ordered a PSA test ("prostate-specific antigen"), which revealed a significantly elevated PSA level. The nurse practitioner requested a urology consult, but the prison doctor denied it. A year later, another PSA revealed an even higher PSA, and a biopsy was finally ordered. That biopsy revealed "high-grade prostatic intraepithelial neoplasia, a precursor to prostate cancer." *Devbrow*, 705 F.3d at 767. Even then, no treatment was ordered. In a follow-up biopsy six months after that, the plaintiff was diagnosed with prostate cancer, but, by that time, the disease had metastasized and his treatment options were limited. The plaintiff did not learn of the cancer diagnosis until October 21, 2005; he learned of the metastasis on December 16, 2005.

The district court construed the claim as a continuing violation that began when the February 2004 PSA result, in conjunction with the plaintiff's history, showed the need for a biopsy, and ended fourteen months later, when the first biopsy was performed. Because the lawsuit was filed more than two years after that, the district court dismissed the action as time-barred. The Seventh Circuit reversed, holding that "[t]he statute of limitations for a § 1983

deliberate-indifference claim brought to redress a medical injury does not begin to run until the plaintiff knows of his injury and its cause." *Id.* at 766. More specifically, the court held that the plaintiff did not actually know of his injury—and the statute of limitations did not begin to run— until he learned from the second biopsy that he had metastatic cancer that might have been diagnosed and treated earlier, but for the defendants' deliberate indifference. *Id.* (citing *Wallace*, 548 U.S. at 387–88).

Rejecting the defendants' argument that the deliberate indifference ended when the defendants sent the plaintiff for a biopsy, because the plaintiff at that point could have sued for nominal or presumed damages, the court stated as follows:

> It is true that a prisoner may obtain nominal damages for an Eighth Amendment deliberate-indifference violation in the absence of a compensable physical injury; actual damages are not an element of the claim. And a prisoner may also bring an Eighth Amendment claim when the deliberate indifference of prison officials creates a likelihood of future harm even if no actual harm is presently manifested.

> But accrual rules are applied to the substance of the claim before the court, and this deliberate-indifference claim seeks redress for a concrete physical injury, not probabilistic future harm or an abstract injury for which nominal damages are available as a remedy. Here, Devbrow alleges that the defendants' deliberate indifference delayed the diagnosis of his cancer until after it had metastasized. Devbrow did not know of that injury any sooner than October 21, 2005, when he received the cancer diagnosis.

*Id.* at 769 (internal citations omitted). The court recognized that, although the plaintiff could have brought a deliberate-indifference claim when he was first referred for a biopsy, and before he had a compensable physical injury in the form of a cancer diagnosis, that was not the claim he had brought. *Id.* Because he sought actual damages for cancer, rather than nominal damages based on the mere failure to refer him for a biopsy sooner, and because he did not know about the cancer until it was diagnosed, the date of the diagnosis was the appropriate accrual date. *Id.*

Likewise, in *Waters v. The Geo Grp., Inc.*, No. 2:15CV282, 2016 WL 4373717 (E.D. Va. Aug. 10, 2016), the prisoner plaintiff alleged that the defendants were deliberately indifferent to

his medical needs when they delayed the eventual diagnosis and treatment of his lymphoma. The defendants argued that the plaintiff's claims accrued no later than April 29, 2013, when he filed an informal complaint about a "large tumor protruding from his neck." *Id.* at *5. They argued that, because he "was aware of his medical condition" at that time, his situation was distinguishable from that of the *Devbrow* plaintiff. *Id.* The court disagreed, noting that, although the plaintiff knew he had a growth, he did not know whether it was malignant or benign until it was biopsied. He learned that it was malignant on June 18, 2013 and that it was lymphoma a month later. The court held that his claims accrued, at the earliest, on the date he learned he had lymphoma and perhaps not until two years later, when he learned that he would suffer from pain and nerve damage for the rest of his life, as a result of the aggressive chemotherapy required due to the delay in diagnosis.

The court also distinguished the facts of that case from those in *Givens v. Luedtke*, 587 F. App'x 979 (7th Cir. 2014), upon which the defendants in this case rely. In *Givens*, the inmate plaintiff alleged that the "defendants unconstitutionally delayed dental care for two months." *Id.* at 979. In January 2007, Dr. Luedtke told Givens he needed to see an oral surgeon for a lesion on the roof of his mouth. *Id.* Despite this, Givens did not receive treatment until March 8, 2007, by which time a "bone was protruding through a hole in his mouth and was gushing pus and blood." *Id.* Three weeks later, Givens was diagnosed with a bone infection. *Id.* Two years later, another dentist told Givens that his bone infection was caused by Dr. Luedtke's use of unsanitary tools during a root canal. *Id.* at 980. The district court dismissed Givens' subsequent suit as time-barred under Wisconsin's six-year statute of limitations applicable to § 1983 actions. *Id.*

On appeal, Givens argued that his claim did not accrue until January 2009, when he learned that Dr. Luedtke had mishandled his root canal. *Id.* The Seventh Circuit rejected that

argument and agreed instead with the district court that Givens's claim accrued on March 8, 2007, when a "bone was protruding through a hole in [Givens's] mouth and was gushing pus and blood," at which time Givens knew he had a "serious injury." *Id.* at 979, 980. The *Givens* court also distinguished *Devbrow*, noting that *Devbrow* found the accrual date to be the date of diagnosis "because [Devbrow] could not have known of the injury any sooner." *Id.* at 980. Givens, however, "knew that his mouth was seriously damaged" in March 2007. *Id.*

The factual scenario presented here is more similar to those in *Devbrow* and *Waters* than to that of *Givens*. Here, Tankesly filed suit on April 1, 2014. There is no dispute that his claims are subject to a one-year statute of limitations and that any claims that accrued prior to April 1, 2013 will be time-barred. The undisputed facts demonstrate that Tankesly saw Martin for a chronic care visit on July 16, 2012, at which time he first complained about a swollen lymph node on the right side of his neck. She ordered a CBC to check for infection. He had a follow-up with her after the CBC on August 16, 2012, and he saw her again on January 8, 2013 and April 30, 2013. The record also establishes that Tankesly saw Orton on April 30, 2013, when she made note of the swelling in his jaw and immediately referred him to Martin, who examined him the same day and referred him to Coble to be seen ASAP. Tankesly also alleges that he continued to complain at the pill window and in letters to prison officials that Martin and Orton would not refer him for additional testing or to see a medical doctor throughout that time period.

Martin and Orton finally referred the plaintiff to Coble on April 30, 2013. Coble examined him on May 3, 2013 and immediately suspected cancer. The plaintiff was not affirmatively diagnosed with cancer, however, until he saw the ENT specialist, Dr. Parey, on May 15, 2013. (*See* Med. Rec. 291–94.) It appears that Coble received Parey's assessment on May 17, 2013 (*see* Med. Rec. 12, 291), and he met with Tankesly to discuss his diagnosis and

expected treatment on May 22, 2013. (Med. Rec. 13.) Tankesly was not informed that he actually had cancer until May 22, 2013.

The record as a whole makes it clear that, beginning in July 2012 and continuing until April 30, 2013, Tankesly was dissatisfied with Martin's (and, to a lesser extent, Orton's) response to his fears about the swelling in his neck and believed that he needed further testing and treatment. Not until his worst fears were confirmed, however, did he have a basis for believing that the practitioners' failure to take his complaints seriously and to refer him to a doctor for further assessment led to the progression of his cancer and the need for more aggressive treatment. The plaintiff now argues that, even though he suspected a problem, he did not actually have reason to know that he had suffered an injury until he learned about the cancer diagnosis and that his cause of action did not accrue until that time. The law appears to support this argument.

Although Tankesly places great emphasis on the defendants' failure to refer him to a physician or for a biopsy from July 2012 until May 2013, his damages claim is based the defendants' alleged delay in ordering further diagnostic treatment, which resulted in a metastatic cancer. In his Verified Complaint, he states that Martin's and Orton's refusal to order tests or refer him to a medical doctor "contributed to the development of the throat cancer" and its progression to a metastatic stage. (Doc. No. 1 at 8 ¶ 5; *see id.* ¶ 15;25, 26, 27.) He claims that his radiation oncologist told him that the delay in treatment resulted in unnecessary complications and progression of the disease. (*Id.* ¶ 20.) In other words, the plaintiff brings suit based, not merely on the failure to provide further testing or referral to a doctor, but on the fact that he developed stage-four metastatic cancer that allegedly could have been prevented or treated when it was much less serious, but for the defendants' alleged deliberate indifference. Like the *Waters*

plaintiff, Tankesly knew that he had a growth in his neck and suspected that it was serious, but he had no way of actually knowing how serious until it was diagnosed as cancerous.

In support of their statute of limitations defense, the defendants also cite to *Hawkins v. Spitters*, 79 F. App'x 168 (6th Cir. 2003), in which the Sixth Circuit affirmed the district court's dismissal of the inmate plaintiff's deliberate indifference claim as time-barred. There, the plaintiff complained for months about inability to sleep. At some point he learned about sleep apnea and made repeated requests between November 1996 and December 1997 to be tested for sleep apnea. These requests were denied. He was finally tested in December 2000 and diagnosed with sleep apnea. In October 2001, he filed suit against numerous defendants, alleging that they were deliberately indifferent to his serious medical needs because they denied his repeated requests for evaluation by a sleep apnea expert.

The district court granted the defendants' motion to dismiss, finding that the claim accrued in January 1997, when the defendants denied the plaintiff's grievance challenging the denial of his request for a sleep apnea evaluation. On appeal, the plaintiff argued that his claim did not accrue until he was actually diagnosed with sleep apnea and that, prior to that date, his claim "would be mere speculation about his condition." The appellate court nonetheless affirmed the dismissal, stating that the limitations period "begins to run when the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred." *Id.* at 169. The court stated:

> Hawkins's argument that his cause of action did not accrue until he was actually diagnosed with sleep apnea is unavailing. In this case, the "violation" being challenged is the denial of his request for medical attention, i.e., an expert sleep apnea evaluation. Prior to his diagnosis, Hawkins was clearly aware that the defendants had rejected his request for such a test and that his grievance had been denied.

*Id.* at 169–70. The facts in that case, too, are distinguishable from those presented here, simply

on the basis that there was no allegation that Hawkins's condition worsened over time or was exacerbated by the defendants' failure to diagnose and treat it sooner. The plaintiff knew, beginning in 1996, that he had difficulty sleeping. He continued to have difficulty sleeping. He was finally diagnosed with sleep apnea, which explained the condition from which he had been suffering and seeking treatment for several years.

Here, Tankesly's condition worsened over time to full-fledged metastatic cancer. He alleges that the delay in treatment contributed to the exacerbation of his condition and the aggressive nature of the treatment required to address it. The court therefore finds that his claim based on the failure to diagnose his condition sooner did not accrue until he learned that he had metastatic cancer on May 22, 2013. The plaintiff filed suit less than one year later, so the claims are not barred by the statute of limitations.

Moreover, with regard to Orton, the plaintiff brings an entirely separate claim based on allegations that Orton was deliberately indifferent to the serious medical conditions the plaintiff suffered as a consequence of his undergoing chemotherapy and radiation—specifically, the sores in his mouth and throat and difficulties swallowing or keeping down food, which caused significant pain and resulted in substantial weight loss. This claim did not arise until August 2013, at the earliest, less than one year before the plaintiff filed suit on April 1, 2014. This claim, as the defendants themselves recognize, is not barred by the statute of limitations.[8]

_____

[8] Even in response to the plaintiff's Objections to the R&R, Orton does not argue that she is entitled to summary judgment on *all* claims against her on the basis of the statute of limitations, but only on the claim based on actions that took place prior to April 1, 2013. She argues that any claim based on actions taken after that date fail because the facts do not establish deliberate indifference. (*See, e.g.*, Defs.' Resp. to Objs., Doc. No. 305, at 8 ("Here, Tankesly initiated this action on April 1, 2014. Therefore, he is barred from recovery for any purported conduct that occurred prior to April 1, 2013. Furthermore, Tankesly has offered zero proof of any discreet unlawful action taken by Orton after April 1, 2013." (citation to the record omitted)).)

Consequently, the court will overrule the magistrate judge's recommendation that the claims against Martin and Orton be dismissed as barred by the statute of limitations.

**B.      Deliberate Indifference**

Tankesly's claims under § 1983 are based on alleged violations of the Eighth Amendment, which "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward [his] serious medical needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . against which [courts] must evaluate penal measures." *Estelle*, 429 U.S. at 102. "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Id.* at 103.

The Supreme Court has established a two-step framework for determining whether certain conditions of confinement constitute "cruel and unusual punishment" prohibited by the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *Reilly v. Vadlamudi*, 680 F.3d 617, 623–24 (6th Cir. 2012). That framework, as applied in the context of a deliberate indifference claim, consists of an objective and a subjective component. *Reilly*, 680 F.3d at 624; *Blackmore*, 390 F.3d at 895.

First, the objective component requires the plaintiff to establish the existence of an objectively serious medical need, measured in light of "contemporary standards of decency." *Reilly*, 680 F.3d at 624 (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). Second, the plaintiff must establish the subjective element by demonstrating that the defendants acted with "a sufficiently culpable state of mind in denying medical care." *Blackmore*, 390 F.3d at 895.

A plaintiff satisfies the objective component by alleging that the prisoner had a medical need that was "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). Tankesly clearly suffered from a serious medical need while he was incarcerated at SCCF: he had stage four, metastatic tonsillar cancer. He had an objectively serious need for medical treatment. *See Blackmore*, 390 F.3d at 897.

The question presented here is whether Tankesly has provided sufficient evidence to prove the subjective component of the deliberate-indifference inquiry. A plaintiff satisfies the subjective component by "alleg[ing] facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). The subjective requirement is designed "to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Id.* (citing *Estelle*, 429 U.S. at 106). The Sixth Circuit has described the mental state of a prison official who has been deliberately indifferent to a prisoner's medical needs as akin to criminal recklessness:

> When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation. On the other hand, a plaintiff need not show that the official acted "for the very purpose of causing harm or with knowledge that harm will result." Instead, "deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."

*Id.* (internal citations omitted; quoting *Farmer*, 511 U.S. at 835–36). The plaintiff bears the burden of proving subjective knowledge, but he may do so with ordinary methods of proof, including by using circumstantial evidence. *Farmer*, 511 U.S. at 842. Indeed, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

Bearing these principles in mind, the court turns to addressing whether Tankesly can prove the subjective component of his claim as to each of the three remaining defendants. *See Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 446–47 (6th Cir. 2014) (noting that each defendant's subjective knowledge should be assessed separately and that information available to one defendant may not be automatically imputed to the others (citing *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005)).

### 1. *Martin*

Tankesly alleges in his Verified Complaint that Martin failed to diagnose the "Suspicious Mass" in his neck for a period of ten months, from July 2012 until May 2013, during which time he repeatedly requested to see a doctor and "even contacted every Corporate and state official that he knew to contact, requesting medical attention." His claims against Martin are based on her failure to order a biopsy or other diagnostic testing and failure to refer him to a doctor. He avers that "the development of [his] cancer could have been averted had Defendants diagnosed this Mass in the ten (10) months that Plaintiff repeatedly requested a diagnosis and/or to see a doctor." (Doc. No. 1, at 7.)

In his response to her Motion for Summary Judgment, the plaintiff also argues that Martin should have reviewed his entire Medical Record in advance of each appointment with him and, thus, that she either knew or should have known that he was complaining about the mass in his neck continuously from the time he saw her in the summer of 2012 until he saw her on April 30, 2013. He also asserts, in his Objections to her Statement of Undisputed Facts, that Martin must have overheard his complaints to other nurses from the medication window. (Doc. No. 271, at 3.)

The court finds that the undisputed facts in the record, viewed in the light most favorable

to the plaintiff, are not sufficient to establish deliberate indifference on Martin's part. First, the record is clear that Martin actually saw and treated the plaintiff on July 16, 2012, August 16, 2012, January 8, 2013, and April 30, 2014. In July 2012, she made note of the knot, ordered a CBC blood panel, and recommended follow-up. Another CBC panel conducted in November 2012 did not provide basis for concern. Martin states in her Declaration that, as of November 2012, she did not have any medical basis for believing that further intervention was required. In January 2013, she saw Tankesly for his chronic care visit. Her medical notes do not reflect that Tankesly complained about the swollen lymph node, but Tankesly alleges that he did and that Martin simply failed to make note of his complaint. Tankesly does not allege that he was suffering any other symptoms related to the swelling as of that date, however. On April 30, 2014, when he clearly had experienced a change in his condition, Martin referred him to Dr. Coble for further evaluation.

The plaintiff does not allege that Martin's deliberate indifference continued after that date. He claims, rather, that she knew or should have known, as of July and August 2012 and January 2013, that the knot on his neck required additional testing and that the tests she ordered were inadequate. He argues that she knew or should have known that he was continuing to complain about the knot in his neck from July 2012 through April 2013, because she must have overheard him complain about it each time he came to the pill window to pick up medications.

Tankesly's insistence that Martin knew or should have known about his continued complaints, even if they were not made directly to her, is unsupported by the Medical Record or by anything other than the plaintiff's rank speculation. The plaintiff does not point to any sick call requests made between August 2012 and April 2013, nor does his medical chart reflect complaints about the swelling during the intervening period. Thus, even if Martin had reviewed

his entire medical chart prior to her appointment with him in January, she would not have seen documentation of repeated complaints about the swollen lymph node. Although it is conceivable, as Tankesly claims, that he complained about the swelling every time he picked up medications and that the nurses distributing his medications failed to make note of it, their failure cannot be attributed to Martin. And, aside from the plaintiff's speculation, there is no basis in the record for assuming that Martin would have been aware of these verbal complaints. Martin specifically denies hearing that Tankesly had made any verbal complaints about the swollen lymph node. (Martin Decl. ¶¶ 10, 15.) Likewise, although the plaintiff wrote numerous letters to Wendy Ashe and others complaining that Martin was ignoring his complaints, the plaintiff has not shown that Martin was aware of these letters.

Moreover, while the plaintiff denies that Martin told him at the August 2012 appointment to "return as needed" if the knot changed or he developed additional symptoms, the plaintiff's subsequent behavior, particularly in April 2013, clearly demonstrates that he knew how to submit sick call requests and how to lodge complaints about his treatment. In short, there is no basis in the record for concluding that Martin knew or should have known that the plaintiff continued to be concerned about the swollen lymph node after she saw him on August 16, 2012 up until she saw him on January 8, 2013.

According to Martin, an enlarged lymph node is most commonly caused by an infection. She attests that the swollen lymph node, in the absence of any other symptoms, did not give her reason to suspect that Tankesly was suffering from any serious illness. (Martin Decl. ¶¶ 6, 7.) Although it is arguable that Martin was negligent in failing to follow the plaintiff's condition more closely or to refer the plaintiff for further testing or evaluation by a doctor, the available evidence is not sufficient to permit a reasonable jury to conclude that she was subjectively aware

of how serious the condition was or, therefore, that she was deliberately indifferent to an objectively serious medical condition.

Generally, "where the prisoner has received some medical attention and now disputes the adequacy of that treatment, the federal courts are reluctant to second-guess prison officials' medical judgments and to constitutionalize claims which sound in state tort law." *Lewis v. McClennan*, 7 F. App'x 373, 375 (6th Cir. 2001) (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)). Where there is no evidence that the medical official was aware of circumstances clearly indicating a serious medical need, there is no basis for concluding that the medical provider was deliberately indifferent to any such need. Here, the record does not show that Martin, prior to April 30, 2013, "was aware 'of facts from which she could and did draw the inference that her conduct posed a substantial risk of serious harm.'" *Reilly*, 680 F.3d at 626 (quoting *Sanderfer v. Nichols*, 62 F.3d 151, 155 (6th Cir. 1995)). Summary judgment in her favor is appropriate.

The court will grant Martin's Motion for Summary Judgment on the basis that the facts, viewed in the light most favorable to the plaintiff, fail to establish that she was deliberately indifferent to the plaintiff's serious medical needs.

### 2. Orton

As suggested above, the plaintiff has two separate claims against Orton. The first is based on her alleged failure to refer the plaintiff to a doctor or to order further testing of the swelling on his neck over the course of ten months, from July 2012 through the end of April 2013, as a result of which the knot developed into stage-four cancer, requiring chemotherapy and radiation for treatment. Second, he alleges that Orton was deliberately indifferent to his serious medical needs during his cancer treatment—that she "deliberately sabotaged" his recovery, perhaps in

retaliation for his having filed a complaint against her.

With respect to the claim for failure to treat or refer, the plaintiff alleges that, beginning in July 16, 2012, he "started asking about a Suspicious Mass [lump] in my neck at sick call and was seen by Susan Martin, Nurse Practitioner, and Karen Orton. . . . In May 2013 <u>after ten (10)</u> <u>months</u> seen by nurses Orton, and Martin, the gradual loss of twenty-five (25) pounds I ask to see a doctor." (Pl. Aff. ¶¶ 1, 5.) In his Verified Complaint, he alleges that Orton repeatedly told him not to worry, that the lump was "nothing to be concerned about." (Doc. No. 1 at 8 ¶ 6.) This is the sum total of the factual evidence (as opposed to argument) concerning Orton's involvement in the plaintiff's treatment prior to his cancer diagnosis. The plaintiff's medical chart does not document that the plaintiff ever saw Orton or was treated by her until April 30, 2013. He saw a Nurse Petty on April 9 and 24, 2013, complaining about the lymph node. By then the node was visibly swollen, and the plaintiff reported pain, coughing blood, and difficulty swallowing; Petty recommended follow up by Dr. Coble. (Med. Rec. 10.) There is no evidence that Orton was involved in those visits.

Even assuming that the plaintiff's allegations are true, that is, that he repeatedly mentioned his swollen lymph node to Orton while picking up medications over the course of the ten months between July 2012 and May 2013, this evidence is insufficient to establish that Orton was subjectively aware of facts that would have led her to believe that the plaintiff was suffering from an objectively serious medical condition or that she was deliberately indifferent to that condition. The undisputed facts establish that, when confronted with more serious symptoms during the plaintiff's visit on April 30, she immediately escalated his complaint to Susan Martin, who referred him to Coble to be seen as soon as possible. While Orton arguably may have been negligent in failing to inquire further into the plaintiff's complaints of a swollen lymph node, the

plaintiff never put in an actual sick call related to that complaint, and there is no suggestion that Orton was informed that the swelling had changed over time or was associated with other symptoms—such as pain, weight loss, difficulty swallowing, or coughing blood—until April 30, 2013. Orton is entitled to summary judgment in her favor on the § 1983 claim arising from her conduct leading up to the plaintiff's cancer diagnosis.

Regarding the plaintiff's claim that she deliberately sabotaged his cancer recovery, the plaintiff alleges, in his Verified Complaint, Sworn Affidavit, and handwritten declaration the following facts that allegedly took place after the plaintiff had been diagnosed with cancer, while he was either undergoing treatment or recovering from the treatment itself:

(1) that Orton intentionally withheld the Ensure that was ordered for Tankesly, leaving him with no nutritional input for days at a time, while he was unable to swallow or keep down any other food (Verif. Compl. ¶ 43; Pl. Aff. ¶¶ 54–57; 63–64; 67–73);

(2) that she intentionally withheld his Lortab and substituted another medication on at least one occasion, thus deliberately depriving him of pain relief (Verif. Compl. ¶ 48);

(3) that she deliberately withheld the plaintiff's prescribed medication for acid reflux for a period of seven days (Verified Compl. ¶ 9; Pl. Aff. ¶¶ 35–37, 39–43);

(4) that she refused to refer him to Dr. Coble when he was unable to take any food or swallow pills, due to the sores in his mouth and throat resulting from radiation and chemotherapy (Pl.'s Decl., Doc. No. 258-1, at 5; Pl. Aff. ¶¶ 9–10);

(5) that she repeatedly threw in the trash notes that the plaintiff left for other medical practitioners regarding his medical treatment and need for medication refills (Pl.'s Decl., Doc. No. 258-1, at 6; Pl's Aff. ¶¶ 23–25); and

(6) that she was continuously rude and disrespectful to him (*see, e.g.*, Pl. Aff. ¶¶ 28, 51).

In her Declaration in support of her Motion for Summary Judgment, Orton does not address most of these allegations. She simply asserts that she provided medical care to Tankesly for numerous issues, including cancer, by providing various forms of treatment and

medications—Boost and Ensure drinks, chronic-care prescription medications, pain medication, PEG tube flushing  and care—as well as by preparing medical packets for his outside appointments and referring him to Coble for pain complaints on June 5 and July 18, 2013. (Orton Decl. ¶¶ 4–10, Doc. No. 219-2.) She asserts that she never refused to provide necessary treatment and that she acted at all times in good faith. (*Id.* ¶¶ 11—12.)

The plaintiff's allegations that Orton was rude and disrespectful do not state an Eighth Amendment claim. The law is clear that the use of harassing or degrading language by a prison official, although unprofessional and deplorable, does not violate an inmate's constitutional rights. *See, e.g.*, *Johnson v. Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (harassment and verbal abuse do not constitute the type of infliction of pain that the Eighth Amendment prohibits). Accordingly, Tankesly fails to state an Eighth Amendment claim against Orton arising from her allegedly spiteful and harassing conduct.

Regarding her withholding of his medication for acid reflux, the plaintiff alleges that Orton intentionally and unnecessarily deprived him of his acid reflux medication for eight days, causing him to suffer from "Severe Acid Reflux for Eight (8) Days unnecessarily and now causing my body to build up the [medication] in my system before it can start working again." (Pl. Aff. ¶ 43.) Generally, a condition is considered to be objectively serious if a medical provider has determined that treatment for it is required. *See Blackmore*, 390 F.3d at 897 ("[A] medical need is objectively serious if it is one that has been diagnosed by a physician as mandating treatment . . . ." (citation omitted)). Further, when a prison official intentionally fails to comply with a medical order or prescription that has already been handed down, this conduct may give rise to an Eighth Amendment claim. *See, e.g.*, *Estelle*, 429 U.S. at 104–05 (noting that intentional interference with prescribed treatment may demonstrate deliberate indifference).

The plaintiff also alleges that Orton deliberately denied him nutrition and medications that had been prescribed in late August 2013, when his mouth was so sore and throat so swollen that he had difficulty swallowing even water (or supplemental nutrition drinks) and that she refused to see him or to refer him to Dr. Coble for a period of approximately five days when he was in desperate pain. (Pl. Aff. ¶¶ 6, 10, 16.) The plaintiff alleges that he lost fifteen pounds during this time frame. (Pl. Aff. ¶ 17; Weight Log, Doc. No. 258-4, at 2.) He further claims that Orton repeatedly and intentionally denied him the Ensure supplemental nutrition drinks prescribed for him by distributing the bottles to other inmates until there was none left for him, thus sabotaging the plaintiff's recovery. (*See* Pl. Aff. ¶ 46 ("It is virtually impossible to keep a record of every time they DID NOT have Ensure, it is so frequent, <u>nearly every weekend</u>, because Orton gave it to anyone.").)[9] He also alleges that, in distributing the Ensure to other inmates, Orton defied a direct order from her supervisor that the flavored Ensure was for Tankesly only.[10] In sum, the plaintiff alleges that Orton intentionally deprived him of medically prescribed treatment, thus contributing to his inability to gain weight and slowing the healing process. The court finds that these allegations, if believed by a jury, would be sufficient to permit the jury to find that Orton acted with deliberate indifference to the plaintiff's serious medical needs during the course of his cancer treatments and his recovery from the residual effects of the radiation and chemotherapy treatments.

---

[9] Although the plaintiff characterizes this conduct as negligent in his Verified Complaint (*see* Pl. Aff. ¶ 46), negligence in this context is a legal conclusion, and it is not clear that Tankesly fully understands the legal effect of that term. Moreover, the court is not required to accept his characterization of the conduct as opposed to the plaintiff's factual description of the conduct itself. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (on motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

[10] As Orton argues, there is no evidence in the record that the plaintiff was allergic to vanilla-flavored Ensure, and he had no constitutional right to be given the flavor of Ensure that he wanted.

The court will therefore deny that part of Orton's Motion for Summary Judgment addressing the plaintiff's post-diagnosis § 1983 claim, but will grant summary judgment to Orton on the § 1983 claim based on her alleged pre-diagnosis behavior.

### 3.    Coble

The plaintiff does not fault Coble for the delayed cancer diagnosis, and the record is clear that Coble was not responsible for any delay in obtaining treatment for the cancer once it had been diagnosed. Rather, as the magistrate judge noted, the plaintiff alleges that Coble acted knowingly, deliberately, capriciously, and arbitrarily with the intent to cause pain and suffering when he (1) substituted Lortab instead of time-released morphine as prescribed by oncologist Dr. Michael Sattasiri, M.D. (Verif. Compl. at 11, 22–23); (2) reduced the plaintiff's pain medication without examining the plaintiff himself (Verified Verif. Compl. at 15, 34); (3) discontinued the plaintiff's "Flavored Ensures" without examining him, having been deliberately misinformed by other members of the SCCF medical staff that plaintiff was able to eat (Verif. Compl. at 13, 16, 22–23, 33, 35); (4) refused to treat plaintiff's weight and muscle loss (Verif. Compl. at 13); (5) refused to check the plaintiff's weight (Verif. Compl. at 23); and (6) denied plaintiff access to a scale to show that he had regained only 7 lbs. of the 67 lbs. he claims to have lost during and after treatment (Verif. Compl. at 33).

The magistrate judge recommends granting summary judgment in favor of Coble on the basis that the plaintiff's allegations, even accepted as true, do not establish deliberate indifference on Coble's part. The magistrate judge reviewed and summarized the medical record and concluded that the record as a whole demonstrated that Coble was actively engaged in the plaintiff's medical treatment during the initial stages of his diagnosis and treatment for cancer and during plaintiff's recovery. He concluded that this record did not support the "plaintiff's

overarching argument that Dr. Coble acted knowingly, deliberately, capriciously, and arbitrarily with the intent to cause pain and suffering." (R&R, Doc. No. 284, at 10–11.) And, with regard to the plaintiff's specific arguments, the magistrate judge found that: (1) the plaintiff's claim based on Coble's prescribing Lortab instead of the "time-released morphine" prescribed by Dr. Sattasiri amounted merely to a disagreement with Coble's decision to substitute one medication for another and his medical decisions regarding the management of the plaintiff's pain during his treatment and recovery, which does not give rise to an Eighth Amendment violation; (2) Coble's reduction of the Lortab dosage in March 2014, three days after the plaintiff was examined by a Dr. Conway but without actually examining the plaintiff himself amounted, at most, to negligence and not to deliberate indifference to the plaintiff's serious medical needs; (3) Coble's discontinuation of Tankesly's Ensure in early April 2014 without personally examining him, based on misinformation deliberately provided to him by other members of SCCF's medical staff, again amounted to negligence, at worst, rather than deliberate indifference; (4) the plaintiff's allegations that Coble refused to treat his weight loss is contradicted by the record, which establishes that Coble and Wendy Ashe arranged for the plaintiff to receive a liquid diet during his recovery, ordered placement of the PEG tub, and ordered that the plaintiff receive Ensure and Boost to supplement his nutrition; and (5) the plaintiff has not shown that Coble refused to treat him for problems arising during his recovery. The magistrate judge characterized the plaintiff's claims as amounting to disagreement with the care provided or challenges to the adequacy of the care. He concluded that summary judgment in favor of Coble was warranted on the basis that "[t]he case before the court is . . . not one where Dr. Coble's care was so woefully inadequate as to amount to no care or treatment at all." (Doc. No. 284, at 13.)

The plaintiff objects, arguing again that the record shows that Coble did not follow all of

the plaintiff's other doctors' recommendations for treatment, specifically nutrition and pain control; that, although Coble ordered a liquid diet, the plaintiff did not actually receive an adequate liquid diet; and that, if "defendant Coble [had] simply looked at Plaintiff's throat following his oral and written complaints, plaintiff would not have suffered." (Doc. No. 298, at 6.) He complains that Dr. Coble did not actually order the PEG tube; rather, he simply "processed the paper work for the PE[G] tube's placement and removal based on the direction of 'outside providers.'" (*Id.* at 3.) He complains that the PEG tube was removed even though, contrary to Coble's allegation, the plaintiff was not actually gaining weight.

The court has reviewed *de novo* the record as a whole in light of the plaintiff's allegations. The plaintiff clearly alleges a serious medical need based on the side effects of the radiation and chemotherapy treatment he was receiving: severe pain from the sores in his mouth and throat, resulting in inability to swallow and drastic weight loss. And Dr. Coble was subjectively aware of the serious medical needs: he ordered placement of the PEG tube as well as the Ensure and Boost nutritional supplements, a liquid diet, and various types of pain medication. In other words, he provided care for the plaintiff's condition. The plaintiff here does not dispute that Coble prescribed pain medications and nutrition supplements; he simply maintains that he needed stronger pain medications and more Boost/Ensure drinks.[11]

The Sixth Circuit, in evaluating deliberate indifference claims, "distinguish[es] between cases where the complaint alleges a complete denial of medical care and those cases where the

---

[11] For instance, in his Verified Complaint, the plaintiff states:

Defendant Coble prescribed one 5. mg. Loritab [sic] twice a day for **CANCER PAIN** eventually raising them to 7.5 mg. twice a day. After 3 weeks of suffering when Plaintiff could NOT bare [sic] the PAIN any longer, Defendant Coble increased the Loritab's [sic] from One 7.5 mg. to two twice a day, leaving Plaintiff to suffer Cancer Pain for Seven (7) Months . . . . The Pain returned every four hours. Defendant Coble ignored Dr. Sattasiri's prescription for Time Released Morphine . . . .

(Verif. Compl. at 22; *see also* Pl. Aff. ¶¶ 7–8.)

claim is that a prisoner received inadequate medical treatment." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Westlake*, 537 F.2d at 860 n.5). "Where a prisoner alleges only that the medical care he received was inadequate, 'federal courts are generally reluctant to second guess medical judgments.' However, it is possible for medical treatment to be 'so woefully inadequate as to amount to no treatment at all.'" *Id.* (quoting *Westlake*, 537 F.2d at 860 n.5).

In this case, there is no question that the plaintiff received extensive treatment related to his tonsillar cancer. The plaintiff disputes whether Coble actually provided care, insisting that the care was primarily provided by outside medical providers. He cannot, however, refute Coble's testimony that he referred the plaintiff to outside specialists immediately after examining him and becoming apprised of the swelling in Tankesly's neck and the other symptoms accompanying it; that Coble coordinated with outside medical staff and the prison medical staff to provide for treatment; that he ordered the placement of the PEG tube; that he ordered medication including Phenergan (for nausea), Miracle Mouthwash, Lortab and other pain medications, nutritional supplementation, among others; and that he monitored and treated Tankesly through reviewing and approving his medical file. (Coble Decl., Doc. No. 219-1.) Although Tankesly would have preferred more aggressive pain medication, the record establishes that Coble prescribed pain medication. "[A] desire for additional or different treatment does not suffice by itself to support an Eighth Amendment claim." *Mitchell v. Hininger*, 553 F. App'x 602, 605, (6th Cir. 2014) (citing *Estelle*, 429 U.S. at 107; *Rhinehart v. Scutt*, 509 F. App'x 510, 513–14 (6th Cir. 2013); *Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004)).

The court will therefore overrule the plaintiff's Objections and grant summary judgment

in favor of Coble.

### C.    State Medical Malpractice Claims

In their Motions, the defendants argue that the state-law medical malpractice claims should be dismissed based on Tankesly's failure to comply with Tennessee's mandatory procedural rules governing the filing of medical malpractice claims.

Specifically, under the Tennessee Health Care Liability Act ("THCLA"), a plaintiff "asserting a potential claim for health care liability" must provide written notice of the claim to each health care provider who will be named as a defendant at least sixty days before filing a complaint based on "health care liability." Tenn. Code Ann. § 29-26-121(a)(1). A "health care liability" action is defined as "any civil action . . . alleging that a health care provider or providers cause an injury related to the provision of, or failure to provide, health care service to a person, regardless of the theory of liability on which the action is based." Tenn. Code Ann. § 29-26-101(a)(1). THCLA enumerates the information that must be included in the pre-suit notice and provides that proof of service of the notice must be filed with the Complaint. Tenn. Code Ann. § 29-26-121(a)(2)–(4). In addition, a plaintiff in a health care liability action is required to file, with his complaint, a certificate of good faith showing that a medical expert has reviewed the claims and the plaintiff's medical records and believes that there is a good faith basis for maintaining the action. Tenn. Code Ann. § 29-26-122(a)

Tankesly does not respond directly to the defendants' arguments regarding compliance with THCLA other than by asserting, without reference to any actual evidence in the record, that he was prohibited from "working on his lawsuit" while he was still housed at SCCF and that the defendants generally controlled his access to the library and legal materials. (Doc. No. 270, at 21.) In his Objections to the R&R, he insists, emphatically, that this is "not a <u>malpractice</u> or

negligence complaint." (Doc. No. 298, at 2.)

On the basis of this disclaimer, the court finds that, insofar as the Verified Complaint may be broadly construed as asserting state-law medical malpractice claims, the plaintiff has affirmatively abandoned such claims. The defendants are therefore entitled to summary judgment in their favor and dismissal of any state law claims.[12]

Even if the plaintiff had not abandoned his claims, the Sixth Circuit Court has concluded that compliance with THCLA is mandatory, even in federal court. *Reed v. Speck*, 508 F. App'x 415, 423 (6th Cir. 2012) (dismissing medical malpractice claim on the basis that the plaintiffs failed to show extraordinary cause to excuse compliance (citing *Myers v. AMISUB (SFH), Inc.*, 382 S.W.3d 300, 311 (Tenn. 2012); *Brandon v. Williamson Med. Ctr.*, 343 S.W.3d 784, 790 (Tenn. Ct. App. 2010)). Although the Sixth Circuit has apparently not addressed this precise issue,[13] Tennessee state courts as well as several district courts have concluded that *pro se* prisoners are required to comply with THCLA before bringing suit for medical malpractice. *See, e.g.*, *Kelly v. S. Health Partners*, No. 3:16-1371, 2017 WL 395096, at *5 (M.D. Tenn. Jan. 30, 2017) (recommending dismissal of medical malpractice claims based on the *pro se* plaintiff's failure to comply with THCLA), *Report and Recommendation adopted*, 2017 WL 998274 (M.D. Tenn. Mar. 15, 2017); *Loyde v. Tennessee*, No. 15-2528-JDT-CGC, 2017 WL 1026016, at *5 (W.D. Tenn. Mar. 15, 2017) (dismissing medical malpractice claim on initial review for failure to comply with notice requirements of THCLA); *Baxter v. Tennessee*, No. 12-1294-JDT-EGB,

---

[12] Insofar as the Complaint may be construed as asserting claims based on violations of the Tennessee Constitution, any such claims are subject to dismissal on the grounds that Tennessee law does not recognize a private cause of action for violations of the Tennessee Constitution. *Bowden Bldg. Corp. v. Tenn. Real Estate Comm'n*, 15 S.W.3d 434, 444–45 (Tenn. Ct. App. 1999); *Cline v. Rogers*, 87 F.3d 176, 180 (6th Cir. 1996).

[13] *Reed* involved injuries to an incarcerated person, but the suit was brought by the prisoner's family after his death.

2015 WL 1064601, at *6 (W.D. Tenn. March 11, 2015) (same); *Mathes v. Lane*, No. E2013-01457-COA-R3-CV, 2014 WL 346676, at *6–8 (Tenn. Ct. App. Jan. 30, 2014) (holding that the plaintiff's status as a *pro se* prisoner did not excuse his failure to comply with the THCLA's procedural requirements).

This court likewise concludes that THCLA applies to *pro se* prisoners. And, because the plaintiff has not shown extraordinary cause for failure to comply with the state procedural rules, any state malpractice claims are subject to dismissal on this basis as well.

## IV. Conclusion

Having conducted a *de novo* review of the defendants' Motions for Summary Judgment in light of the plaintiff's Objections, the court will grant summary judgment and dismiss the claims against defendants Martin and Coble in their entirety. The court will grant in part and deny in part defendant Orton's Motion for Summary Judgment. Specifically, Orton is not entitled to summary judgment on the deliberate-indifference claim against her based upon the plaintiff's allegations that she deliberately withheld necessary treatment and medication from the plaintiff during his cancer recovery. However, the court will grant summary judgment in Orton's favor on the deliberate indifference claim related to her purported role in delaying the plaintiff's cancer diagnosis and on all state-law claims against her.

An appropriate order is filed herewith.

ALETA A. TRAUGER
United States District Judge